RECORD NO. 16-1555

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

_____

**BAYER CROPSCIENCE LP,**

*Plaintiff-Appellant,*

v.

**ALBEMARLE CORPORATION,**

*Defendant-Appellee.*

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

_____

**BRIEF OF APPELLEE**
_____

**John R. Wester
Stephen M. Cox
David C. Kimball
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536**

*Counsel for Appellee*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1555__    Caption: __Bayer CropScience LP v. Albemarle Corporation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Albemarle Corporation__
(name of party/amicus)

_____

 who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature:  s/ Stephen M. Cox                         Date:   September 1, 2016

Counsel for:  Albemarle Corporation

## CERTIFICATE OF SERVICE
**************************

I certify that on _____9/1/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Samuel Batiste Hartzell                    Pressly McAuley Millen
Womble Carlyle Sandridge & Rice, PLLC      Womble Carlyle Sandridge & Rice, PLLC
P.O. Box 831                               P.O. Box 831
Raleigh, NC 27602                          Raleigh, NC 27602

s/ Stephen M. Cox                                     9/1/2016
_____                    _____
     (signature)                                       (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

I.  STATEMENT OF THE CASE....................................................1

A.  Bayer gave up the bulk of its "Meet or Release" protection ...........................................................................1

B.  The peculiarities of the domestic methyl bromide market make unfeasible a market-based model of competitive pricing ......................................................................3

C.  A "value-based" pricing model guided Albemarle's 2014 methyl bromide pricing decisions...............................5

D.  Bayer continued to reap substantial profits in 2014 from the herbicides that contained Albemarle's methyl bromide, even with Albemarle's price increases...................13

E.  Bayer's 2015 price increase was an "across-the-board" increase imposed as the result of a global supply shortage .....18

II.  SUMMARY OF THE ARGUMENT ..........................................19

III.  ARGUMENT .............................................................................24

A.  Albemarle is entitled to summary judgment on Bayer's claim for breach of contract .....................................24

1.  The "good faith" obligation of UCC § 2-305 focuses on the manner in which a seller fixes his price, not on the amount of the price.............................24

a.  "Good faith" requires only non-discriminatory and non-arbitrary pricing ...........25

b.  "Good faith" does not require the lowest price or even a fair market price .........................27

i

# TABLE OF CONTENTS
(continued)

Page

2. Albemarle's manner of pricing methyl bromide in 2014-15 was fully consistent with § 2-305's "good faith" standard...............................................29

    a. Albemarle applied its pricing in a non-discriminatory fashion, giving Bayer the best price between its customers ........................29

    b. Albemarle fixed its 2014-15 methyl bromide prices in a manner that was not arbitrary, using (i) a value-based pricing method that Bayer has acknowledged as appropriate and (ii) an across-the-board increase to reflect a decrease in global supply ....................................30

3. Bayer's attempt to create a genuine issue of material fact as to whether Albemarle priced methyl bromide "in good faith" is unavailing ..............33

4. Bayer's focus on Albemarle's motives behind its price increases is irrelevant............................................37

5. In any event, Bayer waived all arguments based on a common law duty of good faith and on the UCC's "honesty in fact" standard of Va ......................41

6. The district court's application of § 2-305 to the facts of this case was sound............................................43

7. Bayer's prior material breach prevents it from suing Albemarle for breach of the Agreement .............45

B. The district court Properly Granted Summary Judgment to Albemarle on Bayer's UDTPA Claim................................50

1. Bayer cannot bring a UDTPA claim against Albemarle based on an "inequitable assertion of power or position." ........................................................51

ii

# TABLE OF CONTENTS
(continued)

**Page**

    2.    Any claim that Bayer brings for an allegedly deceptive representation by Albemarle fails because Bayer did not believe the representation .........54

IV.    CONCLUSION ...........................................................................57

V.    REQUEST FOR ORAL ARGUMENT ......................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trading & Prod. Corp. v. Fairfax Cty. Bd. of Sup'rs*,
   214 Va. 382, 200 S.E.2d 529 (1973) ............................................................26

*Autry Petroleum Co. v. BP Products N. Am., Inc.*, No. 4:05-CV-
   113CDL, 2008 WL 693800 (M.D. Ga. Mar. 12, 2008),
   *aff'd on different grounds*,
   334 F. App'x 982 (11th Cir. 2009) ...............................................................39

*Bumpers v. Cmty. Bank of N. Virginia*,
   367 N.C. 81, 747 S.E.2d 220 (2013) .............................................................56

*Casserlie v. Shell Oil Co.*,
   121 Ohio St. 3d 55, 902 N.E.2d 1 (2009).................................... 26, 27, 30, 38

*CoreTel Virginia, LLC v. Verizon Virginia, LLC*,
   808 F.3d 978 (4th Cir. 2015) ................................................................. 41, 51

*Dodge v. Ford Motor Company*,
   204 Mich. 459, 170 N.W. 668 (1919) ...........................................................37

*Enomoto v. Space Adventures, Ltd.*,
   624 F. Supp. 2d 443 (E.D. Va. 2009) ............................................................40

*Exclaim Marketing, LLC v. DirecTV, LLC*,
   134 F. Supp.3d 1011 (E.D.N.C. 2015) ..........................................................54

*Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*,
   692 F.3d 507 (6th Cir. 2012) ........................................................................41

*Hageman v. Twin City Chrysler–Plymouth Inc.*,
   681 F. Supp. 303 (M.D.N.C. 1988) ........................................................ 56, 57

*Halifax Corp. v. First Union Nat'l Bk.*,
   262 Va. 91, 546 S.E.2d 696 (2001) ...............................................................40

*Harvey v. Fearless Farris Wholesale, Inc.*,
    589 F.2d 451 (9th Cir. 1979) ........................................................................27

*Havird Oil Co. v. Marathon Oil Co.*,
    149 F.3d 283 (4th Cir. 1998) .......................................................................27

*Horton v. Horton*, 254 Va. 111,
    487 S.E.2d 200 (1997) ..................................................................... 46, 47, 49

*In re Fairchild Aircraft Corp.*,
    6 F.3d 1119 (5th Cir. 1993), *abrogated on other grounds by Texas*
    *Truck Ins. Agy. v. Cure,* 110 F. 3d 286 (1997) ...................................... 41, 43

*James Baird Co. v. Gimbel Bros., Inc.*
    64 F.2d 344 (2d Cir. 1933) ...........................................................................45

*Kham & Nate's Shoes No. 2 v. First Bk. of Whiting*,
    908 F.2d 1351 (7th Cir. 1990) ............................................................... 44, 45

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) .......................................................................38

*McInerney v. Pinehurst Area Realty, Inc.*,
    162 N.C. App. 285 (2004) ....................................................................... 52, 53

*Pleasant Valley Promenade v. Lechmere, Inc.*,
    120 N.C. App. 650, 464 S.E.2d 47 (1995) ...................................................56

*PSI Energy, Inc. v. Exxon Coal USA, Inc.*,
    17 F.3d 969 (7th Cir.1994) ...........................................................................39

*Scott v. Harris*,
    550 U.S. 372 (2007)......................................................................................10

*Shell Oil Co. v. HRN, Inc.*,
    47 Tex. Sup. Ct. J. 1015, 144 S.W.3d 429 (Tex. 2004) ....................... passim

*South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*,
    284 F.3d 518 (4th Cir. 2002) ........................................................... 52, 53, 54

*Stoney Glen, LLC v. S. Bank & Trust Co.*,
    944 F. Supp. 2d 460 (E.D. Va. 2013) .............................................................40

*Tandberg, Inc. v. Adv. Media Design, Inc.*,
    No. 1:09-CV-863, 2009 WL 8705814 (E.D. Va. 11, 2009) .........................49

*TCP Indus., Inc. v. Uniroyal, Inc.*,
    661 F.2d 542 (6th Cir. 1981) .......................................................................29

*Tucker v. Boulevard At Piper Glen, LLC*,
    150 N.C. App. 150, 564 S.E.2d 248 (2002) ................................................59

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Connecticut*,
    156 F.3d 535 (4th Cir. 1998) .......................................................................42

*Wayman v. Amoco Oil Co.*,
    923 F. Supp. 1322 (D. Kan. 1996), *aff'd mem.*, 145 F.3d 1347
    (10th Cir. 1998) ............................................................... 26, 27, 28

*Wolf v. Fed. Nat. Mortg. Ass'n*,
    830 F. Supp.2d 153 (W.D. Va. 2011) ..........................................................37

**Statutes**

Va. Code § 8.1-103 .........................................................................................40

Va. Code § 8.2-103 .........................................................................................42

Va. Code § 8.2-305 ................................................................................ 17, 24

Va. Code Ann. § 2-305 ............................................................................ passim

**Other Authorities**

1 James J. White & Robert S. Summers, Uniform Commercial Code §
    3–8 (4th ed. 1995) .........................................................................................27

Walter D. Malcolm, The Proposed Commercial Code:  A Report on
    Developments from May 1950 through February 1951, 6 Bus.
    Law. 113 (1951) .............................................................................................28

# I.     STATEMENT OF THE CASE

Although Bayer's Statement of Facts is generally correct with respect to the procedural history of this dispute and the parties' pre-2014 pricing negotiations, the Statement omits a number of critical—and undisputed—relevant facts. Albemarle provides these below.

## A.     Bayer gave up the bulk of its "Meet or Release" protection.

On pages 6-7 of its brief, Bayer gives cursory treatment to an aspect of its negotiations with Albemarle that the district court found particularly notable.  Prior to March 1, 2009, the methyl bromide contract between the parties (the "Agreement") required Bayer to purchase from Albemarle 80% of the methyl bromide that it needed for its Kansas City herbicide operations.  J.A. 21.  The Agreement also contained a "meet or release" provision,[1] which gave Bayer the right to shop for a better price and buy methyl bromide from another seller—but only if Albemarle first refused to match that seller's lower price.  J.A. 22.

In 2009, Bayer negotiated away its "meet or release" right with respect to 80% of its methyl bromide purchases.  J.A. 34.  At the same time, Bayer agreed to purchase 100% of its methyl bromide from Albemarle, retaining its meet or release rights with respect to only 20% of its requirements.  J.A. 34.  This history belies

---

[1]     This provision is found under the "Meet Competition" heading of the Agreement, but the parties referred to it colloquially as a "meet or release" provision.

Bayer's assertion, made throughout its brief, that "Bayer was effectively at the mercy of Albemarle."  Brief of Appellant, D.E. 14 (hereinafter, "*Bayer Br.*") at p. 19.  To the contrary, as the district court recognized, Bayer was a sophisticated, multibillion dollar corporation[2] that had agreed, in an arm's length transaction, to give up a valuable contract right protecting it from an abrupt rise in methyl bromide prices.  J.A. 84.  If Bayer was "at the mercy" of anything, it was its own poor negotiating decision.

To be sure, Bayer's surrender of most of its meet or release protection did not give Albemarle unfettered pricing power.  Albemarle was still constrained by the UCC to "fix" the price of methyl bromide "in good faith."  Va. Code Ann. § 2-305(2) (hereafter, "Section 2-305" or "§ 2-305").[3]  The district court found that there was no genuine issue of material fact indicating that Albemarle had acted otherwise.  J.A. 83.

---

[2]      Bayer Cropscience reported net sales of 9.5 billion euros in 2014 and 10.4 billion euros in 2015.  *See* http://www.annualreport2015.bayer.com/financial-statements/notes-to-the-consolidated-financial-statements-of-the-bayer-group/general/key-data-by-segment-region.html

[3]      Bayer contends to this Court that it was comfortable giving up most of its "meet or release" rights because it "reasonably believed that Albemarle would not engage in . . . opportunistic behavior because [Albemarle] would instead honor its obligations to act with honesty in fact and to set prices in a commercially reasonable manner."  *Bayer Br.* at p. 7.  This is a *post hoc* characterization of Bayer's negotiating intentions, for there is nothing in the record to indicate what (if anything) Bayer was thinking when it surrendered its meet and release protection.

2

To support its holding, the district court pointed to the peculiar nature of the domestic methyl bromide market and Albemarle's reliance on a "'value in use' analysis to determine the appropriate price to charge Bayer[.]" J.A. 82-83.

### B. The peculiarities of the domestic methyl bromide market make unfeasible a market-based model of competitive pricing.

Bromine is an essential component of methyl bromide, and only two companies in the world have commercially available access to elemental bromine reserves in the United States. *See* Declaration of Wes Ware in Support of Albemarle Corporation's Motion for Summary Judgment (hereinafter, "*Ware Decl.*") at ¶ 4 (J.A. 152-53). Albemarle is one of these companies; the other is Chemtura Corporation ("Chemtura"). Both Albemarle and Chemtura obtain their domestic elemental bromine from salt deposits in central Arkansas. *Id*. Unlike Chemtura, however, Albemarle no longer manufactures methyl bromide itself, but pays Chemtura to convert—or "methylate"—Albemarle's elemental bromine into methyl bromide. *Ware Decl.* at ¶ 6 (J.A. 153). Albemarle then sells that methyl bromide to companies like Bayer. *Ware Decl.* at ¶¶ 6-7 (J.A. 153). This relationship—referred to in the industry as "tolling"—is governed by a "tolling agreement" executed by Chemtura and Albemarle, under which Chemtura charges Albemarle a "tolling fee." *Ware Decl.* at ¶ 6 (J.A. 153); *see also* J.A. 208-217 (Chemtura-Albemarle Tolling Agreement).

3

In the district court, Bayer repeatedly claimed that Albemarle's tolling arrangement made it little more than a "middleman." (J.A. 578-79). This disparaging characterization ignores the considerable effort and expertise that Albemarle put into extracting and transporting the bromine that it delivered to Chemtura for transformation into methyl bromide. As Bayer has conceded through its ranking official in the parties' contractual relationship, Albemarle has developed special expertise in handling these dangerous, corrosive chemicals—for which it deserves to be compensated. Deposition of Bayer's Hemant Kandlur, March 18, 2015 (hereinafter, "*Kandlur Dep.*") at 195:24-196:20 (J.A. 181-82). Far from being a mere "middleman," Albemarle is much more akin to an experienced wheat farmer, who uses his skills and takes the risks to produce a crop that he delivers to a miller to grind into flour.

Albemarle's expertise is especially significant because importing methyl bromide from foreign sources is both expensive and subject to significant regulatory hurdles. *See* Deposition of Albemarle's Wesley Ware, March 19, 2015 (hereinafter, "*Ware Dep.*") at 43:19-44:7 (J.A. 221-22) 45:11-46:21, (J.A. 223-24) and 177:5-18 (J.A. 241); *Kandlur Dep.* at 95:11-96:6 (J.A. 168-69). Thus, Chemtura is the only domestic producer of methyl bromide and, with Albemarle, one of only two domestic suppliers of the compound. *Ware Decl.* at ¶ 8 (J.A. 153).

4

Domestic demand for methyl bromide in the United States has decreased sharply in recent years—so sharply, in fact, that Albemarle now sells methyl bromide to only two customers in the United States. *Ware Decl.* at ¶ 9 (J.A. 153-54). Those two companies are Bayer and another company that purchases methyl bromide on a "spot" basis (*i.e.*, without a long-term contract). *Id.* In 2014 and 2015, Albemarle charged both Bayer and its other customer substantially the same price (but slightly less to Bayer). *Id.*

As the district court recognized—relying on undisputed evidence—what all of this means is that "the market for methyl bromide is limited" and "there is therefore no fair market price against which to compare the price charged by Albemarle to Bayer." J.A. 82. Heavy regulation, a phase-out of the compound, and the high degree of expertise demanded of those companies that produce, transport and handle it have led to the development of an extremely limited group of domestic buyers and sellers, without a prevailing "fair market price." *Id.*

## C.    A "value-based" pricing model guided Albemarle's 2014 methyl bromide pricing decisions.

As Bayer points out in its brief, the methyl bromide price that Albemarle charged Bayer under the Agreement increased from $.51/lb. in 2000 to $1.85/lb. in 2012 and 2013. *Ware Decl.* at ¶ 11 (J.A. 154). In late 2013, however, two developments led to the steeper 2014 and 2015 price increases that are at issue in this case.

5

First, as part of an internal restructuring, Albemarle shifted responsibility for methyl bromide to its Specialty Chemicals Division, which was already responsible for Albemarle's other bromine-related products. *Ware Decl.* at ¶ 12 (J.A. 154-55). After the restructuring, Albemarle's Wes Ware became the company's global product manager for methyl bromide, with responsibility for setting the price of the compound beginning in 2014. *Id.* In that new role, Mr. Ware adopted a "Value-In-Use" analysis to determine an appropriate price to charge Bayer for methyl bromide. *Ware Decl.* at ¶ 10 (J.A. 154). To conduct this analysis, Mr. Ware consulted published sources to determine Bayer's retail pricing. In addition, he worked with Albemarle's research chemists to make reliable estimates concerning Bayer's raw material costs. *Ware Dep.* at 96:21-97:15 (J.A. 228-29); 142:2-143:9 (J.A. 233-34); *Ware Dep. Ex.* 95 (Mr. Ware's Value-in-Use Analysis) (J.A. 251-53). Making those determinations allowed Mr. Ware to estimate the value that Albemarle's methyl bromide bore to the overall value of Bayer's herbicides to the marketplace. *Ware Decl.* at ¶ 10 (J.A. 154). Such an analysis also allowed Mr. Ware to determine the extent to which Bayer could absorb a methyl bromide price increase by Albemarle and remain profitable. *Id.*

Critically, Bayer does not deny that a value-based analysis is an appropriate way to price a product. Indeed, as Hemant Kandlur (Bayer's head of procurement for chemicals in North America and Bayer's corporate 30(b)(6) representative)

acknowledged, "when a company makes a product, it's appropriate, [to some extent], to price that product based on the value that it brings to the marketplace." *Kandlur Dep.* at 197:11-16 (J.A. 183). Notably, Mr. Kandlur conceded that he did not know what an appropriate price would be for Albemarle to charge to reflect the value of its expertise in the bromine and methyl bromide markets, *Id.* at 196:21-197:1 (J.A. 182-83), nor did he know whether the price that Albemarle had been charging before 2014 was *too low*. *Id.* at 189:13-190:7 (J.A. 179-80). His ignorance on this subject was not surprising for, unlike Mr. Ware, Mr. Kandlur had never even looked at, much less analyzed, the margin and cost data that Mr. Ware attempted to forecast when determining a value-based price for Albemarle to charge for methyl bromide. *Id.* at 62:19-23 (J.A. 165).

Separate and apart from Mr. Ware's value-based pricing analysis, the second development that caused Albemarle to raise Bayer's methyl bromide price in 2014 was the renegotiation of Albemarle's tolling agreement with Chemtura. *Ware Decl.* at ¶ 14 (J.A. 155). In that renegotiation, Chemtura increased its tolling fee *fourfold*—from \$.31/lb. to \$1.26/lb. *Id.* (J.A. 208-09). That dramatic rise in Chemtura's tolling fee had an immediate, significant impact on the overall costs that Albemarle incurred to produce the methyl bromide to be sold to Bayer. In fact, as negotiations with Chemtura had revealed Chemtura's intent to escalate its tolling fee, Albemarle told Bayer in January 2014 to expect "significant"

corresponding methyl bromide price increases. *Kandlur Dep.* at 75:7-25 (J.A. 167). Bayer fails to mention, however, even once in its brief, that Albemarle gave it warning of steep impending price increases months before any such increases took effect.

Once Chemtura's increased tolling fee took effect on January 30, 2014, Albemarle's costs to produce methyl bromide actually *exceeded* the $1.85/lb. it had been charging Bayer throughout 2013, causing Albemarle to lose money every time it supplied Bayer with methyl bromide. *See Ware Decl.* at ¶ 15 (J.A. 156); *Ware Dep.* at 76:10-78:8 (J.A. 225-27); *Ware Dep. Ex.* 74 (J.A. 249-50). Albemarle was not able immediately to raise its methyl bromide price to Bayer to account for the new Chemtura tolling fee because the Chemtura contract had not been finalized until the end of January 2014, and Albemarle could not raise its price to Bayer until the next calendar quarter.[4] *Ware Decl.* at ¶ 15 (J.A. 156). Thus, when Bayer ordered a railcar of methyl bromide in February 2014 at

---

[4]  Bayer maintains that Albemarle deliberately waited until after January 1, 2014 to give notice of its 2014 price increase, so as to lengthen the period that Bayer would be "locked into" the Agreement. *Bayer Br.* at pp. 9-10. This argument is meritless. Undisputed evidence shows that the new Chemtura agreement was not executed until after January 1, 2014 (J.A. 211); thus, Albemarle could not have made a final decision about what to charge Bayer until then. And in any event, Bayer has conceded that Albemarle had warned it—while Albemarle's negotiations with Chemtura were underway—that a "significant" price increase to Bayer would result from a renegotiation of the Chemtura agreement. *Kandlur Dep.,* at 75:7-12 (J.A. 167).

$1.85/lb., Albemarle shipped roughly 170,000 pounds of methyl bromide to Bayer, at a loss of approximately $25,000. *Ware Decl.* at ¶ 16 (J.A. 156).

Ultimately, Mr. Ware's preliminary Value-in-Use analysis led him to believe that a methyl bromide price increase to $4.09/lb. (from $1.85/lb.) was appropriate. That increase was the amount needed to maintain a profit margin of approximately 60% on Albemarle's methyl bromide business—the average margin that Albemarle had been enjoying in 2013, before Chemtura increased its tolling fee. *Ware Decl.* at ¶ 17  (J.A. 156); *Ware Dep.* at 103:19-23 (J.A. 230); *see also* Albemarle's Resp. to Second. Int., Exhibit A (setting forth profit margins on bromine derivative business) (J.A. 270).[5]

Bayer's professes that it is "unclear" why the district court "credited" this 60% margin figure (*Bayer Br.* at p. 36 n. 6).  Yet it appears twice in the record: first, in Mr. Ware's Declaration at Paragraph 17 (J.A. 156) and, second, as the mathematical average of the 2013 methyl bromide margins reflected in Albemarle's Responses to Bayer's Second Interrogatories (J.A. 270).  Albemarle

---

[5]    These interrogatory responses may be found at J.A. 265-72 and were included as Exhibit K to Albemarle's Memorandum in Support of its Motion for Summary Judgment.  The term "margin," as used in those responses and as generally used by Mr. Ware when evaluating Albemarle's methyl bromide business, means "contribution margin"—the sales price of the product minus its variable costs.  J.A. 266.  In 2013, Albemarle's average contribution margin on its methyl bromide business (including sales to both Bayer and Albemarle's much smaller customer, Tri-Cal) was 59.8%.  J.A. 270.

cited both of these sources to the district court (*see* J.A. 714), yet Bayer failed to rebut them, except to cite Mr. Ware's imperfect, off-the-cuff recollection, over which Albemarle's actual accounting records prevail. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (refusing to credit witness testimony that was inconsistent with uncontroverted videotape evidence).

Bayer's own employee has admitted that it was not unreasonable for Albemarle to raise its price to an extent necessary to maintain its methyl bromide profit margin. Deposition of Bayer's Mark Southgate, October 15, 2015 (hereinafter, "*Southgate Dep.*") at 43:19-44:8 (J.A. 279-80), an admission noted by the district court. J.A. 83. The first price increase—to $4.09/lb. from $1.85 per lb., thereby returning margins to 60%—took effect on April 1, 2014.

After that first 2014 increase, Mr. Ware continued to refine his Value-In-Use analysis throughout the spring and summer of 2014. *Ware Dep.* at 142:15-143:2 (J.A. 233-34). In May, Mr. Ware conferred with Albemarle's senior research chemist to verify the chemistry and associated costs that informed that analysis. *Ware Dep.* at 147:1-24 (J.A. 235). At the same time, Mr. Ware was continuing to investigate the retail herbicide market to gain a better understanding of Bayer's retail pricing practices and, ultimately, Bayer's profit margins on its products that used Albemarle's methyl bromide. *Ware Dep.* at 147:25-148:23 (J.A. 235-36). Mr. Ware's analysis had earlier indicated that, at $4.09/lb., Albemarle's methyl

bromide accounted for only seven percent of the retail price of Bayer's products that used Albemarle's methyl bromide and only 19 percent of Bayer's costs of raw materials for the same products. *Ware Dep. Ex.* 95 (J.A. 252); *Ware Dep.* at 149:11-150:7 (J.A. 237-38).

Ultimately, Mr. Ware's Value-In-Use analysis established that, at $8.49/lb., Albemarle's methyl bromide would account for only 14 percent of Bayer's retail price and 32 percent of its raw materials costs. *Ware Dep. Ex.* 95 (J.A. 252); *Ware Dep.* at 150:8-13 (J.A. 238). The effect of this increase (implemented effective July 1, 2014) was to reflect better the value that Bayer derived from using Albemarle's methyl bromide in light of the substantial profits that Bayer was enjoying (as described below). Albemarle's resulting profit margin, of 81%, was consistent with the profit margin that Albemarle was earning on its most profitable bromine derivatives. *See* Albemarle's Resp. to Second. Int., Exhibit A (setting forth profit margins on bromine derivative business) (J.A. 270).

Although the amount of Albemarle's second methyl bromide price increase was determined by Mr. Ware's Value-In-Use analysis, the timing of the increase was driven by Bayer's own brinksmanship and efforts to exert leverage over Albemarle. When Bayer had issued its original "blanket purchase order" to Albemarle for the 2014 methyl bromide buying season, with a price of $1.85/lb., both Bayer and Albemarle knew that that purchase order would have to be updated

11

to reflect the new price of methyl bromide following the Chemtura tolling fee increase.  Deposition of Bayer's William Ziegler (hereinafter, "*Ziegler Dep.*") at 155:18-2 (J.A. 286).  But in response to Albemarle's March 2014 price increase, Bayer refused to submit to Albemarle updated purchase orders reflecting the new $4.09 price through the end of the 2014 buying campaign.  *Ziegler Dep.* at 156:3-157:16 (J.A. 287-88); *Ware Dep.* at 163:9-12 (J.A. 239).  This refusal led Albemarle to believe (rightly, as it turned out) that Bayer was planning to breach the contract.  *Ware Dep.* at 174:3-21 (J.A. 240).[6]

Bayer's refusal to submit updated purchase orders also put Albemarle in the difficult position of not knowing whether it could confidently order from Chemtura the methyl bromide that Bayer had indicated that it would need for the full 2014 buying season.  If Albemarle had ordered methyl bromide from Chemtura without a confirming purchase order from Bayer with the correct price, Albemarle risked having Bayer reject the methyl bromide and being stuck with methyl bromide that it could not sell to anyone else.  *Ware Decl.* at ¶ 18 (J.A. 156-57).  On the other hand, if Albemarle waited to receive an updated purchase order (with the correct price) before ordering methyl bromide from Chemtura, it risked having Bayer wait

---

[6]     As the district court held, Bayer first breached the parties' Agreement, beginning in April 2014, by buying methyl bromide from Chemtura without first offering the same terms to Albemarle, as required by the Agreement's meet or release clause.  J.A. 80.

until the last minute to submit such a purchase order and being unable to secure the methyl bromide from Chemtura in time to provide the product. *Id.*

For a time, despite Bayer's refusal to update its purchase orders, Albemarle negotiated with Bayer to resolve the dispute over the $4.09 price increase. In a major compromise offered in May 2014, Albemarle proposed to freeze the price of methyl bromide at $4.09/lb. through the end of December 2015—forgoing its contractual right to raise the price once per calendar quarter—if Bayer would commit to buying all of its methyl bromide from Albemarle during that same period. *Kandlur Dep.* at 159:6-18 (J.A. 174). Bayer refused that offer; its representative now admits, in hindsight, that Albemarle's offer "would have been a pretty good deal." *Id.* at 160:9-14 (J.A. 175). Once it became clear that Bayer was neither going to update its purchase orders nor attempt to negotiate a reasonable compromise, Albemarle gave notice of the new, $8.49/lb. price that its earlier Value-in-Use analysis had suggested was reasonable. *Ware Decl.* at ¶ 19 (J.A. 157). Thereafter, Bayer finally updated its purchase orders to reflect correct pricing. *Ziegler Dep.* at 159:10-13 (J.A. 289).

### D. Bayer continued to reap substantial profits in 2014 from the herbicides that contained Albemarle's methyl bromide, even with Albemarle's price increases.

On several occasions, Bayer's employees complained to Albemarle that Albemarle's 2014 price increases (to $4.09/lb. in April and $8.49/lb. in June)

would be financially devastating. *Kandlur Dep.* at 56:16-20 (J.A. 164). Discovery proved those claims false. As Bayer's corporate designee admitted, and as the figures below show, Bayer cannot point to any significant adverse effect on the company's herbicide profit margin as a result of the higher price of methyl bromide Albemarle charged in 2014. Deposition of Bayer's Paul Walters (hereinafter, "*Walters Dep.*") at 94:15-95:2 (J.A. 298-99).

| Axiom | | | |
|---|---|---|---|
| | Gross Profits | Gross Profits Margin | Variable Cost/Unit |
| 2012 | 2,398,517 | 54.6 | 5.93 |
| 2013 | 2,899,580 | 55.6 | 5.96 |
| 2014 | 2,124,512 | 54.1 | 5.97 |
| Flufenacet | | | |
| | Gross Profits | Gross Profits Margin | Variable Cost/Unit |
| 2012 | 4,336,897 | 15.7 | 16.80 |
| 2013 | 5,773,771 | 17.2 | 15.83 |
| 2014 | 7,411,326 | 17.0 | 16.21 |
| Metribuzin (250 kg) | | | |
| | Gross Profits | Gross Profits Margin | Variable Cost/Unit |
| 2012 | 169,566 | 16.5 | 10.82 |
| 2013 | 35,823 | 28.0 | 10.24 |
| 2014 | 309,497 | 23.6 | 9.82 |
| Metribuzin (500 kg) | | | |
| | Gross Profits | Gross Profits Margin | Variable Cost/Unit |
| 2012 | 1,223,063 | 19.2 | 10.43 |
| 2013 | 1,683,116 | 28.5 | 10.01 |
| 2014 | 517,676 | 19.8 | 9.80 |
| Sencor | | | |
| | Gross Profits | Gross Profits Margin | Variable Cost/Unit |
| 2012 | 685,379 | 87.1 | 5.15 |
| 2013 | 710,208 | 86.8 | 5.31 |
| 2014 | 669,547 | 86.3 | 5.17 |
| | | | |

14

The information above is taken from an accounting spreadsheet produced by Bayer in discovery and confirmed by Bayer's 30(b)(6) designee.[7]  It conclusively demonstrates that, contrary to Bayer's protestations to Albemarle, the company's profit margins were *not* significantly affected by Albemarle's 2014 increases in methyl bromide prices.  In fact, Bayer's total profits on the above five herbicides were virtually unchanged between 2013 and 2014—from $11,102,498 (in 2013) to $11,032,558 (in 2014).  Most noteworthy, Bayer's variable costs per unit *fell* for three of the herbicides above, remained virtually constant for another (Axiom) and rose only slightly for Flufenacet, even though the cost of methyl bromide (a variable cost) had risen from $1.85/lb. to $8.49/lb. in 2014.  Neither Mr. Walters nor Mr. Kandlur could explain how this happened.  *Walters Dep.* at 71:6-11 (J.A. 297); *Kandlur Dep.* at 67:17-24 (J.A. 166).

---

[7]    The spreadsheet itself is found at J.A. 301.  The "Gross Profits" column in the information above corresponds to the "Revised I[ntegrated] G[ross] M[argin] without Target Price Impact" column on the spreadsheet (Column P); the "Gross Profit Margin" column above corresponds to the "Revised I[ntegrated] G[ross] M[argin]% without Target Price Impact" column on the spreadsheet (Column Q); and the "Variable Cost/Unit" column above corresponds to the "Adjusted Total Variable Cost Per B[asic] U[nit] O[f] M[easurement]" column on the spreadsheet (Column N).  The 2015 figures on the spreadsheet are forecasts only and are thus not included above; Bayer's 2015 accounting information was never provided in discovery.  *Walters Dep.* at 64:25-65:4 (J.A. 295-96).  For clarification, Mr. Walter's testimony was based on a slightly different version of the referenced spreadsheet, which was revised slightly following his deposition to correct some clerical errors, as noted in an email from counsel for Bayer found at J.A. 303.  These revisions do not materially alter Mr. Walter's deposition testimony.

Bayer contended in a reply brief to the district court that this data was "based on a flawed and limited interpretation of the evidence." J.A. 586. In particular, Bayer complained that the figures did not include 2015 profit and cost information or take account of a special "target price adjustment." J.A. 586-87. Yet Bayer's 30(b)(6) designee on this subject admitted at his March 2015 deposition that 2015 cost and profit information would not be available until the end of 2015. *Walters Dep.* 64:25-65:4 (J.A. 295-96), and Bayer has yet to produce the information. Indeed, the 2015 figures that Bayer included in its accounting spreadsheet were not actual amounts, but budgeted forecasts. *Id.* And the "target price adjustment" that Bayer mentions was an internal price reduction that Bayer applied only to its 2015 forecasts, not its 2014 actual profit and cost figures. *See* J.A. 301 ("Target Price Adjustment included in COGM.") In short, despite Bayer's protestations, no record evidence contradicts Albemarle's showing that Bayer made a very healthy profit on its 2014 herbicide sales, even *after* paying higher prices to Albemarle for the methyl bromide that went into those herbicides.

The above information is not only economically notable; it is legally relevant for two reasons. First, these figures refute Bayer's claim that Albemarle's pricing strategy was commercially unreasonable. Namely, they prove that Mr. Ware's Value-In-Use analysis was dead-on—permitting Bayer's lucrative herbicide profits to remain virtually unchanged between 2013 and 2014, while

allocating additional value to Albemarle (which, after all, was supplying an essential ingredient of the herbicides).

These profit figures also rebut Bayer's claim that Albemarle acted commercially unreasonably by purportedly misrepresenting the reason for its March 2014 price increase. As Mr. Kandlur acknowledged during his deposition, pricing negotiations can get "pretty intense," and "sometimes business is bare knuckled." *Kandlur Dep.* at 147:19-148:7, (J.A. 147-48). Nevertheless, Bayer excoriates Albemarle for allegedly lying about the reason for its March 2014 price increase, contending that such deceit breached Albemarle's duty to "observ[e] reasonable commercial standards of fair dealing in the trade." Va. Code § 8.2-305 cmt. 3. Yet Bayer was doing the same thing: seeking to gain the upper hand in "bare knuckled," and "intense" pricing negotiations, it said whatever it thought would be effective, regardless of whether its statements were true. Mr. Kandlur, for example, insisted to Albemarle that its price increases would be financially devastating, even though he had never "looked at how the increase in price would affect Bayer's costs or its margin." *Kandlur Dep.* at 62:19-23 (J.A. 165). Bayer's William Ziegler told Albemarle's Matt McGucken that Bayer's cost to produce herbicide in Kansas City was already higher than the cost of buying it in China, even though he didn't know if that statement were true or not. *Ziegler Dep.* at 244:16-245:25 (J.A. 290-91); *Dep. Ex.* 113 (J.A. 260). And Mark Southgate has

acknowledged that he suggested that Bayer "mislead Albemarle about purchasing metribuzin from China," "when in fact [Bayer] had no plans to purchase metribuzin from China." *Southgate Dep.* 10/16/2015 at 48:15-25 (J.A. 281); *Dep. Ex.* 103 (J.A. 254). Even if Albemarle misled Bayer about the reason for its March 2014 price increase (which Albemarle does not concede) such conduct can hardly be branded as violating a "reasonable commercial standard[] of fair dealing in the trade" when Bayer, which was "in the trade" itself, was acting exactly the same way.

### E.     Bayer's 2015 price increase was an "across-the-board" increase imposed as the result of a global supply shortage.

Unlike Albemarle's first and second price increases in 2014, the third price increase initiated by Albemarle was not based on a Value-In-Use calculation. Instead, that increase was an "across the board" increase that Albemarle implemented with respect to a range of bromine derivatives sold to a variety of customers. *Ware Decl.* at ¶ 20 (J.A. 157). This price increase resulted from a decreased global supply of elemental bromine due to labor disruptions at an Israeli bromine facility. *Id.* Albemarle delivered similar notifications—of a similar price rise—to numerous other customers for bromine-related products. *Id.*

## II.    SUMMARY OF THE ARGUMENT

This dispute arises from a multimillion dollar chemical sales contract entered into between two sophisticated corporations.  The contract contained an open price term governed by UCC § 2-305, which requires a seller to fix the price for his product "in good faith."  The overwhelming majority of courts that have construed this obligation have concluded that it gives the seller wide latitude to price his goods, so long as he does not act discriminatorily or arbitrarily.  In particular, § 2-305 does *not* require the seller to charge a "fair market price," a competitive price, or one that ensures that his buyer can turn a profit.  To hold otherwise, courts have reasoned, would undermine the ability of sophisticated commercial parties to negotiate their own open price contracts—turning every pricing dispute under such a contract into a judicial "rate-setting" case.

The district court adopted this predominant interpretation of § 2-305, rejecting Bayer's argument that Albemarle had raised its price for methyl bromide too steeply and too quickly.  The court noted that Bayer had not alleged discriminatory pricing by Albemarle, and that Albemarle had relied on a "value in use" analysis to set its prices.  Refusing to set aside the parties' own bargain, the district court went on to observe that (i) the contract gave Albemarle the express right to raise its price for methyl bromide once per calendar quarter and (ii) Bayer had earlier negotiated away a "meet or release" provision in the contract that would

19

have permitted it to buy methyl bromide from another supplier if Albemarle's prices became too high.

Criticizing the district court's "flawed, circular" reasoning, Bayer contends on appeal that the court's respect for the parties' express contract eliminated entirely the implied obligation of UCC § 2-305. *Bayer Br.* at p. 29. Bayer's contention ignores the district court's express recognition of the "good faith" obligation. *See* J.A. 81 ("[T]he seller may fix any price he may wish by the express qualification that the price so fixed must be in good faith.") Further, the district court concluded that Albemarle had not exceeded the few limitations that § 2-305 imposed on its pricing power (by, for example, pricing its methyl bromide so as to drive Bayer out of business). To the contrary, as the court observed, the record evidence indicated that Albemarle had acted in a non-arbitrary manner by employing a "value-based" analysis to set its price. That method took into account the value that Albemarle's methyl bromide provided to Bayer's herbicide business, yet still ensured that Bayer would receive a fair return. Bayer itself conceded in discovery the legitimacy of value-based pricing, and it continued to reap substantial profits from its herbicides even *after* Albemarle raised its prices considerably in 2014. What really exercised Bayer in 2014, it is now clear, was *not* that Albemarle was acting in bad faith. Rather, it was that Albemarle's new

20

"value-based pricing" model would force Bayer to share a fairer portion of its enormous herbicide profits with Albemarle.

Bereft of any evidence to support its claims of commercially unreasonable behavior on Albemarle's part, Bayer falls back on speculation concerning Albemarle's motive. Time and again throughout its brief, Bayer contends that Albemarle's true intent was to use its "infinite leverage" under the parties' contract to get all the profit it could. But as numerous courts have held, a party's subjective intentions hold no relevance in determining good faith under § 2-305. And in any event, as the district court recognized, any "leverage" that Albemarle had was the product of Bayer's own decision to surrender the "meet or release" clause in the parties' contract (presumably for a favorable concession in return). Furthermore, there is no evidence that the ensuing rise in Albemarle's price was arbitrary; rather, as noted above, the undisputed evidence is that Albemarle employed a value-based pricing model that Bayer itself has acknowledged as legitimate.

In considering the parties' cross-motions for summary judgment, the district court ultimately concluded that it need concern itself with only the first of Albemarle's three price increases—the one that became effective in April 2014. That was so, the court held, because Bayer had conceded that it had breached the contract in May 2014 by buying methyl bromide from another supplier without notifying Albemarle. If Albemarle's first price increase were made in good faith,

then, Bayer's prior material breach would prevent it from challenging Albemarle's subsequent two price increases.

Challenging this holding, Bayer makes two arguments that it never made to the district court: (i) that its breach, even if prior, was not "material," *Bayer Br.* at pp. 42-44, and (ii) that it "cannot be[] the law" that Albemarle could continue to perform the contract, despite Bayer's breach, and then breach the agreement itself. *Id.* at p. 45. Bayer has waived both of these arguments by not pressing them below. But even if it had made them, they are of no avail. Virginia law (which governs the parties' agreement) does not require evidence of damages to prove materiality, and there is ample record evidence to show that Bayer's breach was material. And despite Bayer's protest about what "cannot be[] the law," the well-reasoned opinion cited by the district court in its holding (which reviews decades of Virginia Supreme Court cases) proves that the district court's view is precisely the law.

Finally, Bayer contends that the district court erred by rejecting Bayer's unfair trade practices claim. First, Bayer argues that the district court failed to recognize that Albemarle had committed the unfair trade practice of "inequitably asserting its power or position." *Bayer Br.* at p. 47. It was not the court that failed to recognize that argument, however; it was Bayer that failed to make it. Having so failed, Bayer has waived the argument on appeal. In any event, as noted above,

any negotiating leverage that Albemarle exercised was not "inequitable," but the by-product of Bayer's own decision to give up its "meet or release" right.

Bayer also contends that Albemarle committed the unfair trade practice of misrepresenting the justification for its price increase. The district court summarily rejected this argument, holding that Bayer had admitted that it did not believe Albemarle's representation and thus could not establish the reliance that was a necessary element of the claim. Bayer begins its challenge to this holding by asserting that the court "confuse[d] deception, which Bayer is not required to show, with reliance." *Id.* at p. 53. It is Bayer, however, that is confused here. The case law cited by the district court makes it clear that a plaintiff who cannot show that it believed the defendant's deception cannot establish the causation (*i.e.*, "that the deceptive practice worked") necessary to prevail on an unfair trade practices claim. *Id.* Bayer—having conceded that it did not believe Albemarle's explanation for its price increase—is thus barred from making such a claim here.

# III.    ARGUMENT

**A.    Albemarle is entitled to summary judgment on Bayer's claim for breach of contract.**

**1.    The "good faith" obligation of UCC § 2-305 focuses on the manner in which a seller fixes his price, not on the amount of the price.**

Just as it did in the district court, Bayer focuses on the *amount* of the prices that Albemarle charged for methyl bromide rather than on the *manner* in which Albemarle fixed those prices. *See, e.g., Bayer Br.* at pp. 20, 32. What this approach overlooks is that the UCC does not require a seller to charge a particular amount for its product (such as a "fair market price" or a competitive price). Rather, Virginia Code[8] § 8.2-305(2) demands only that sellers like Albemarle "*fix in good faith*" the prices charged. No provision of the law requires a particular "good faith price," and for good reason—such a standard would turn every pricing dispute into a rate-setting exercise and force the courts to act as market makers.

Heedless of this principle, Bayer opens its argument with a graph showing the historical increases in Albemarle's methyl bromide prices. *Bayer Br.* at 20, and it places great weight on the extent of the 2014-15 price increases compared to earlier price rises. *Id.* at pp. 20, 32. Bayer apparently hopes that these numbers will generate "sticker shock" that will move this Court. Yet the amounts of the

---

[8]    Virginia law governs the parties' contract and Bayer's breach of contract claim.

price increases alone are meaningless, especially because Bayer's own head of methyl bromide procurement (and 30(b)(6) designee) has admitted that he does not know what Albemarle should have charged to account for its considerable expertise in handling dangerous chemicals like bromine and methyl bromide. *Kandlur Dep.* 196:21-197:1 (J.A. 182-83). Nor does Bayer know whether the prices that Albemarle was charging it before 2014 were *too low*. *Id.* at 189:13-190:7 (J.A. 179-80).

Bayer's preoccupation with the raw extent of Albemarle's 2014-15 price increases infects its entire brief. A proper application of UCC § 2-305 to a seller's pricing practices, however, begins and ends not with the amount the seller charged, but with a determination whether the seller acted in an discriminatory or arbitrary manner. In making this determination, an appreciation of the wide latitude that the UCC gives the seller to price his goods in a free market is essential.

### a.    *"Good faith" requires only non-discriminatory and non-arbitrary pricing.*

The overwhelming majority of cases interpreting UCC § 2-305 conclude that good faith in an open-price term contract demands principally that a seller not discriminate among similarly situated buyers. "[T]he chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent discriminatory pricing—*i.e.*, to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different pricing for arbitrary or

25

discriminatory reasons." *Shell Oil Co. v. HRN, Inc.*, 47 Tex. Sup. Ct. J. 1015, 144 S.W.3d 429, 434 (Tex. 2004), *quoting Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1332 (D. Kan. 1996), *aff'd mem.*, 145 F.3d 1347 (10th Cir. 1998). Other courts across the country have likewise emphasized anti-discrimination as the touchstone of legitimacy under § 2-305. *See Wayman*, *supra*, 923 F. Supp. at 1346-47; *see also Casserlie v. Shell Oil Co.*, 121 Ohio St. 3d 55, 59, 902 N.E.2d 1, 5 (2009) (quoting *Wayman*); *HRN*, 47 Tex. Sup. Ct. J. 1015, 144 S.W.3d at 434 (same).

The only Virginia case interpreting § 2-305—a case that Bayer omits from its brief but that the district court cited—adopts the same deferential standard, noting that a seller under an open price contract must "act reasonably and treat alike all consumers similarly situated." *Am. Trading & Prod. Corp. v. Fairfax Cty. Bd. of Sup'rs*, 214 Va. 382, 386, 200 S.E.2d 529, 532 (1973) (emphasis added). The *Am. Trading* court further held that "the party that is to set the price [must] not have the power to act arbitrarily." *Id.*, cited at J.A. 81.

The UCC's focus on anti-discriminatory pricing is reflected in the so-called "safe harbor" provision described in official Comment No. 3 to § 2-305, which provides:

> Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a "posted price" or a future seller's or buyer's

"given price," "price in effect," "market price," or the like satisfies the good faith requirement.

A "posted price," "given price," "price in effect," or "market price" is by definition nondiscriminatory. For this reason, many courts have presumed that such prices are "fixed in good faith" in accordance with Section 2-305. *See, e.g., Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 293 (4th Cir. 1998) (noting that "seller charged all its customers . . . the same posted rack price.").

Under the foregoing, manifestly deferential legal standard, cases in which a buyer challenges a price under UCC § 2-305 often result in summary judgment for the seller. *See, e.g., HRN*, 47 Tex. Sup Ct. J. 1015, 144 S.W.3d at 438; *Wayman*, 923 F. Supp. at 1373; *Casserlie*, 121 Ohio St. 3d at 61-62, 902 N.E.2d at 6. Bayer's professed surprise that Judge Boyle "prevented a jury from considering 'the facts of the case'," *Bayer Br.*, p. 17, overlooks this jurisprudence.

> **b.**     ***"Good faith" does not require the lowest price or even a fair market price.***

What Section 2-305 demands is "good faith." What it does not demand is a "good *price*."

> **A good-faith price under section 2.305 is not synonymous with a fair market price or the lowest price available.** *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 548 (6th Cir. 1981); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir. 1979); *see also* 1 James J. White & Robert S. Summers, Uniform Commercial Code § 3–8, at 150 (4th ed. 1995) ("**Note that the section says 'a reasonable price' and not 'fair market value of the goods.' These two would not be identical.**").

27

*Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 437 (Tex. 2004) (emphasis added).

While market pricing may be *sufficient* to establish that the price was fixed in good

faith, it is by no means *necessary* to make such a showing. This is so because

market pricing is appropriate only when a robust market exists for a product; as the

district court observed, no such market exists for methyl bromide in the United

States. *Order p.* 7 (J.A. 82)

Courts' refusal to look to "market" or "competitive" pricing as a benchmark

of good faith reflects an effort to keep judges from falling into the role of market

overseers. The Texas Supreme Court has explained the danger of this potential

pitfall:

> Beyond prohibiting discriminatory pricing, the drafters [of § 2-305]
> wished to minimize judicial intrusion into the setting of pricing under
> open price-term contracts. They understood that requiring sellers in
> open-price industries, such as the oil and gas industry, to justify the
> reasonableness [of] their prices in order to satisfy section 2.305 would
> "mean[] that in every case the seller is going to be in a lawsuit" and
> that every sales contract would become "a public utility rate case."

*HRN*, supra, 47 Tex. Sup. Ct. J. 1015, 144 S.W.2d at 435, *quoting* Walter D.

Malcolm, The Proposed Commercial Code: A Report on Developments from May

1950 through February 1951, 6 Bus. Law. 113, 186 (1951). For this reason, sellers

under § 2-305 are afforded wide latitude in setting their prices, provided they do

not behave in an arbitrary or discriminatory manner.

This very dispute confirms the wisdom of the UCC's drafters and the *HRN* court in seeking to avoid judicial management of a complex industry. In its brief, Bayer claims that Albemarle "overcharge[d] Bayer by roughly $29 million," *Bayer Br.*, p. 14, a number which it derives based on a methyl bromide price of $2.80/lb. Yet Bayer cites no evidence (because none exists) of any private party's ever charging $2.80/lb. for methyl bromide at any time in history. And in fact, Bayer's head of procurement for chemicals admitted that he did not know (1) what would be a fair price to charge for methyl bromide, nor (2) whether Albemarle's competitor, Chemtura, was charging a price that was too low. *Kandlur Dep.* 190:1-7 (J.A. 180); 196:21-197:1 (J.A. 182-3). Bayer should not ask this Court to do what Bayer itself—armed with years of experience in the market and plenty of data within its reach—cannot do. To hold otherwise would accomplish precisely what the *HRN* court warned against: convert this Court into a *de facto* rate setter.

### 2. Albemarle's manner of pricing methyl bromide in 2014-15 was fully consistent with § 2-305's "good faith" standard.

#### a. *Albemarle applied its pricing in a non-discriminatory fashion, giving Bayer the best price between its customers.*

As explained above, a general disdain for discriminatory pricing is one of the primary justifications for Section 2-305, and it provides the basis for the presumptively appropriate conduct described in the "safe harbor" of Comment No. 3. Namely, a "posted price," "given price," "price in effect," or "market price"

is by definition nondiscriminatory. "A price that is nondiscriminatory among similarly situated buyers correspondingly qualifies as a 'posted price' or the like." *Casserlie*, 121 Ohio St. 3d at 59, 902 N.E.2d at 6.

As the district court observed, "Bayer has not alleged any discriminatory pricing by Albemarle[.]" J.A. 81. The undisputed evidence is that Albemarle sold methyl bromide to only one customer other than Bayer in the relevant 2014-15 time period—and then on only one occasion. *Ware Decl.* at ¶ 9 (J.A. 153-54). It charged that customer $8.60/lb. in September 2014, slightly *higher* than the $8.49/lb. price charged to Bayer, because the other customer was purchasing methyl bromide on a "spot" basis without a long-term contract. *Id.* Constricted by this undisputed evidence, Bayer can point to no facts suggesting that it was the victim of discriminatory pricing.

> **b.** **Albemarle fixed its 2014-15 methyl bromide prices in a manner that was not arbitrary, using (i) a value-based pricing method that Bayer has acknowledged as appropriate and (ii) an across-the-board increase to reflect a decrease in global supply.**

Not only were Albemarle's 2014-15 methyl bromide prices non-discriminatory, they were fixed in a manner that was not arbitrary. Evidence that Bayer does not dispute—but which it does omit from its brief—demonstrates that Albemarle performed a Value-In-Use analysis to fix its 2014 prices. As Albemarle explained in its Statement of Facts, *supra* at pp. 6-7, Wes Ware conducted this

analysis when he took responsibility for pricing Albemarle's methyl bromide at the beginning of 2014. *Ware Decl.* at ¶ 10 (J.A. 154). Mr. Ware's analysis revealed that Bayer enjoyed substantial profits on its herbicide products that incorporated Albemarle's methyl bromide. *Id.* As a result, Mr. Ware surmised that Bayer could—and should—pay Albemarle more money for the value it received from Albemarle's product. *Id.* In particular, Mr. Ware's analysis supported Albemarle's initial price increase to $4.09/lb. that went into effect on April 1, 2014, as well as the second price increase to $8.49/lb. that went into effect on July 1, 2014.

Hemant Kandlur, Bayer's head of procurement for chemicals in North America who testified as Bayer's corporate designee, admitted that value-based pricing is an appropriate way for a seller to fix prices:

> **Q:** You understand that when a company prices a product -- when a company makes a product, it's appropriate to price that product based on the value that it brings to the marketplace, correct?
>
> **Kandlur:** To some extent, yes.
>
> **Q:** And to some extent, that value should reflect any particular expertise the producer of that product has developed or infrastructure it's developed, or things along those lines, correct?
>
> **Kandlur:** Yes.

*Kandlur Dep.* 197:11-16 (J.A. 183).  Mr. Kandlur also admitted that he did not

know what an appropriate price would be for Albemarle to charge for methyl

bromide using such a value-based pricing method:

> **Q:**  And as we sit here today, you don't know what an appropriate
> price would be for Albemarle to charge to reflect the value of its
> expertise and competence and infrastructure in the bromine and
> methyl bromide market, do you?
>
> **Kandlur:**  No.

*Id.* at 196:21-197:1 (J.A. 182-83).

Bayer can hardly decry as "arbitrary" a value-based pricing method that its own

30(b)(6) witness has conceded as legitimate, especially because Albemarle's

application of the model left Bayer with substantial profits from its herbicide

business and did not seek to drive Bayer from the marketplace.  *See supra* at pp.

13-15.

Albemarle's third and final 2014-15 price increase, which went into effect

on April 1, 2015, resulted from a decreased global supply of elemental bromine

due to labor disruptions at an Israeli bromine facility.  *Ware Decl.* at ¶ 20 (J.A.

157).  This final price increase was part of an "across the board" increase applied

to a range of bromine derivatives sold to a variety of customers, and it was added

on to the prices previously set using Mr. Ware's Value-In-Use analysis.  *Id.*

Bayer does not deny that Mr. Ware conducted a value-based pricing method

that prompted Albemarle's 2014 price increases.  Nor does Bayer deny that there

was a shortage of elemental bromine in 2015, or that Albemarle's resulting price increase was imposed on a number of its customers for bromine derivatives. This undisputed evidence more than satisfies the deferential standard for non-arbitrary pricing behavior under UCC § 2-305. To hold otherwise would turn courts into arbiters of the business judgment of sophisticated commercial parties operating in complex industries.

> **3. Bayer's attempt to create a genuine issue of material fact as to whether Albemarle priced methyl bromide "in good faith" is unavailing.**

Though Bayer insists that there is "ample evidence from which a reasonable juror could conclude that Albemarle breached its duty to set prices in a commercially reasonable manner," *Bayer Br.* at p. 31, it offers only two examples of such evidence. First, Bayer contends that Wes Ware conceded that he did not give any consideration to what was "commercially reasonable" when fixing Albemarle's methyl bromide prices. *Id.* Yet Bayer omits from its brief Mr. Ware's explanation of what he understood the phrase "commercially reasonable" to mean:

> **Q:** What did you understand that phrase commercially reasonable to mean when [Bayer's counsel] propounded that question to you?
>
> **Ware:** To me that meant via third-party market studies.
>
> **Q:** Did you conduct any third-party market studies in conjunction with the first price increase?

**Ware:**  No, sir.

**Q:**  To what, if any, extent did you undertake an analysis to determine whether the increased price that would become effective in the second quarter of 2014 was a price that Bayer could tolerate?

**Ware:**  It was via my own internal and external research to determine the value-in-use pricing model that arrived at the, yes, $4.09 per pound price.

*Ware Dep*. 196:17-197:17 (J.A. 711).

As this exchange demonstrates, Mr. Ware did not consider the market pricing of other sellers of methyl bromide because he, like the numerous courts discussed *supra*, concluded that market pricing is not the only way to fix a price in good faith.  This is especially true in a case like this one, in which there is only one other domestic seller of methyl bromide (Chemtura).  Moreover, because even Bayer has admitted that it did not know whether Chemtura's price might be too low, *Kandlur Dep*. at 189:13-190:7 (J.A. 179-80), knowledge of that price could not have helped Mr. Ware make Albemarle's own pricing decision.

The second example Bayer offers of Albemarle's allegedly commercially unreasonable behavior is a trend of "rapidly accelerating price increases" after Bayer had given notice, on February 13, 2014, of its intention to terminate the Agreement at the end of the year.  *Bayer Br*. at p. 32.  What this argument ignores, however, is the undisputed evidence that Albemarle had *already* warned Bayer—in January 2014—to expect significant price increases as a result of Chemtura's

34

pending tolling fee increase. *Kandlur Dep.* at 75:13-25 (J.A. 167). Thus, before it gave its notice of contract termination, Bayer knew that its methyl bromide prices would rise significantly.

In any event, Albemarle had an absolute right under the Agreement to raise its methyl bromide prices on 15 days' written notice. (J.A. 22). It is undisputed that Albemarle gave timely notice in connection with all three price increases that are the subject of this appeal. By arguing that Albemarle acted in bad faith by manipulating the timing of its price increases, Bayer is attempting to impose additional notice requirements on Albemarle beyond those agreed to by the parties. In essence, Bayer seeks to use the implied good faith obligation of § 2-305 to "trump" Albemarle's express right to raise its prices on 15 days' notice. This it cannot do, according to Virginia law:

> When parties to a contract create valid and binding rights, one party does not breach the U.C.C.'s obligation of good faith by exercising such rights. In fact, an implied covenant of good faith and fair dealing is inapplicable to those rights. Further, an implied covenant of good faith and fair dealing cannot be the vehicle for rewriting an unambiguous contract in order to create duties that otherwise do not exist.

*Wolf v. Fed. Nat. Mortg. Ass'n*, 830 F. Supp.2d 153, 169 (W.D. Va. 2011) (internal quotations omitted). In sum, Albemarle cannot be held liable for deciding not to give more notice of its price increases than that required by the express terms of the Agreement.

35

Having failed to adduce any evidence of Albemarle's alleged bad faith, Bayer falls back on speculation—surmising that Albemarle must have been acting illicitly because its profit margin allegedly rose from "less than 20%" before February 2014 to 60% in April 2014. *Bayer Br.* at 33. Even if Albemarle's profits had risen by that extent, however, the amount of a price increase alone cannot constitute bad faith, given § 2-305's focus on the manner in which the price is established. Yet, and as the district court found, Bayer's profit margin before and after its first, April 2014 price increase was the same: 60%. J.A. 82-83. And as the district court further observed, Bayer's own employee conceded that a price increase by Albemarle to maintain its profit margin would not be unreasonable. *Id., Southgate Dep.* 43:19-44:8 (J.A. 279-80).

To blunt its own employee's admission, Bayer challenges the district court for accepting Albemarle's uncontested, actual accounting records as proof that Albemarle's profit margin before and after its first price increase was 60%. *Bayer Br.* at pp. 36-37. Bayer notes that Mr. Ware, in his deposition, admitted that Albemarle's margin before its first price increase was 20%. *Id.* at 36. Albemarle explained to the district court that Mr. Ware—in giving this testimony—was testifying in a purely personal capacity (not as a 30(b)(6) designee) and was not given the opportunity to review any actual business records. J.A. 737. After Mr. Ware's deposition, Bayer solicited and received Albemarle's actual accounting

36

records proving that its margin had been maintained at 60%. (J.A. 266, 270) There is no evidence in the record contesting the authenticity or accuracy of these records. The district court rightly held that these actual accounting records supplanted Mr. Ware's hazy personal recollection and did not raise a genuine issue of material fact. J.A. 83 n. 1.

Of course, whether Albemarle's pre-2014 profit margin was 20% or 60% is irrelevant; the company had the right to raise its methyl bromide prices as it saw fit, so long as it did not do so arbitrarily or discriminatorily. What really angers Bayer was that Albemarle's value pricing analysis caused it to realize that it had been undercharging Bayer, and that it could raise its prices while leaving plenty of room for Bayer to make money itself. Such a profit motive is one that drives every business. *See Dodge v. Ford Motor Company*, 204 Mich. 459, 507, 170 N.W. 668, 684 (1919) ("A business corporation is organized and carried on primarily for the profit of the stockholders."). Had Bayer wished to keep more of its herbicide revenue for itself, it should have retained its broad "meet or release" right or otherwise negotiated for a limit on the extent of Albemarle's price increases. Its remedy lies in the power of contract, not in the power of this Court.

### 4. Bayer's focus on Albemarle's motives behind its price increases is irrelevant.

Time and again throughout its brief, Bayer urges this Court not to accept the undisputed facts concerning the bases for Albemarle's price increases, but instead

to find that Albemarle's real motive was to use its "infinite leverage" to extract all the profit that it could from Bayer. *See, e.g., Bayer Br.* at p. 33. With few exceptions, however, courts have emphatically rejected the notion that a party's subjective intent in setting a price should inform the "good faith" analysis under Section 2-305:

> [I]t is not apparent . . . why the intent behind a commercially reasonable, non-discriminatory price should matter for purposes of a breach of contract claim under section 2.305(b). . . . **Premising a breach of contract claim solely on assumed subjective motives injects uncertainty into the law of contracts and undermines one of the UCC's primary goals—to promot[e] certainty and predictability in commercial transactions.**

*HRN*, 47 Tex. Sup. Ct. J. 1015, 144 S.W.3d at 435 (citations omitted) (emphasis added); *accord Casserlie*, 121 Ohio St. 3d at 60-61, 902 N.E.2d at 6.

The Texas Supreme Court in *HRN* rejected the Fifth Circuit's construction of Texas law in *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002)—a case relied on by Bayer in support of its argument that § 2-305 takes heed of a party's subjective intent. *Bayer Br.* at p. 28. The *Mathis* court had held that the duty to act in good faith under Texas' version of § 2-305 included a subjective component of "honesty in fact." *Mathis,* 302 F.3d at 456. The *HRN* court rejected a subjective approach, noting that its effect was "to allow a jury to determine in every [§ 2-305] case whether there was any improper motive animating the price-setter." 144 S.W. 3d at 435 (internal quotations omitted).

38

As another court, echoing the reasoning of *HRN,* has noted:

> Plaintiffs' proffered evidence of dishonesty in fact and commercial unreasonableness consists primarily of statements of their subjective belief that Defendant acted unfairly and contrary to the parties' expectations …. **The problem with Plaintiffs' argument is that it would permit one party's notion of "unfairness" to trump the express terms of the parties' contract…. At least one Circuit has recognized the folly of this argument.** As explained by the Seventh Circuit, "[i]n commercial transactions [governed by the UCC] ... the question is not what is fair but what comports with the contract."... "By enforcing contractual language rather than molding it until the outcome looks more fair ex post, courts in the end serve all contracting parties' interests."

*Autry Petroleum Co. v. BP Products N. Am., Inc.*, No. 4:05-CV-113CDL, 2008 WL 693800, at *1 (M.D. Ga. Mar. 12, 2008), *aff'd on different grounds*, 334 F. App'x 982 (11th Cir. 2009) *quoting* (*PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 974 (7th Cir.1994) (emphasis added).

The same "folly" identified by the court in *Autry Petroleum* animates Bayer's arguments. Bayer claims that "[e]ven if Albemarle had the right to use its contractual position to raise the per-pound price from $1.85 to $4.09 (and then again to $8.49 and $11.04), it did not have the right to conceal that it was using that leverage by falsely attributing the price rise to increased costs." *Bayer Br.* at p. 50. No provision of the Agreement, however, required Albemarle to follow any particular method in setting its price, much less explain to Bayer its method. Bayer invites the Court to "permit one party's notion of 'unfairness' to trump the express terms of the parties' contract," precisely what the *Autry* court warned against. *Id.*

39

To buttress its argument, Bayer cites a handful of non-UCC cases that apply common law articulations of the good faith standard. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Connecticut*, 156 F.3d 535, 542 (4th Cir. 1998) (examining good faith obligation in a mining contract); *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 462 (E.D. Va. 2013) (examining good faith obligation in a "Debt Settlement Agreement"); *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 446 (E.D. Va. 2009) (examining good faith obligation in an "Orbital Space Flight Purchase Agreement" pertaining to space tourism). In the two pages it devotes to this argument, Bayer cites not a single case involving the UCC, much less one that supports the insertion of a subjective standard of "honesty in fact." *See Bayer Br.* at pp. 50-52. Yet when the UCC speaks to a particular standard or rule of conduct, it displaces corresponding principles of common law. *See* Va. Code § 8.1-103 (providing that "principles of [common] law and equity" survive "[u]nless displaced by the particular provisions of [the UCC]"); *Halifax Corp. v. First Union Nat'l Bk.*, 262 Va. 91, 104, 546 S.E.2d 696, 704 (2001) (holding that UCC had displaced common law claim for breach of contract between bank and its customer, including claim that bank had acted in bad faith). Section 2-305's establishment of a statutory standard of good faith thus displaces—and renders irrelevant—any common law standard upon which Bayer may rely.

**5.** **In any event, Bayer waived all arguments based on a common law duty of good faith and on the UCC's "honesty in fact" standard of Va. Code by failing to present those arguments to the district court.**

Even if the common-law duty of good faith applied here, Bayer has waived all arguments based on that duty because it failed to present them to the district court. "If a party wishes to preserve an argument for appeal, the party must press and not merely intimate the argument during the proceedings before the district court." *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 808 F.3d 978, 988 (4th Cir. 2015) (citations omitted). "In other words, the party must raise the argument in a manner sufficient to alert the district court to the *specific reason* the party seeks relief." *Id.* (citations omitted, emphasis added). Other courts of appeals, applying this principle, have held that (i) making an argument to the district court in a "cursory footnote," *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 692 F.3d 507, 513 (6th Cir. 2012) or (ii) citing cases that make an argument without presenting the argument itself fully, *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993), *abrogated on other grounds by Texas Truck Ins. Agy. v. Cure,* 110 F. 3d 286, 289 (1997) are insufficient to preserve the argument for appellate review.

In its first summary judgment brief presented to the district court,[9] Bayer conceded that the Agreement was "governed [by] the Uniform Commercial Code (UCC) as enacted by Virginia." *Bayer Op. Br.,* at pp. 14-15 (J.A. 559-60). Accordingly, all of the arguments that Bayer presented to the district court concerning Albemarle's alleged breach of the duty of good faith were based on the text of the UCC itself or on UCC cases. *See, e.g., Bayer Op. Br.* at pp. 14-16 (J.A. 559-61); *Bayer Resp. Br.* at pp. 6-8 (J.A. 581-83); and *Bayer Rep. Br.* at pp. 2-3 (J.A. 65-66). Bayer did not make any arguments based on Virginia's common law of contracts.

Nor did Bayer contend to the district court that Albemarle had breached the UCC's general duty to act with "honesty in fact," found in Va. Code § 8.2-103(1)(b). Bayer did *quote* this statute in its three summary judgment briefs. *Bayer Op. Br.* at p. 15 (J.A. 560), *Bayer Resp. Br.* at p. 6 (J.A. 581) and *Bayer Repl. Br.* at p. 2 (J.A. 65). But nowhere in any of these briefs did Bayer *argue* that Albemarle's conduct violated the statute in some way. Instead, the only UCC provision that Bayer contended that Albemarle had breached was § 2-305. Just as a party may not preserve an issue for appeal by citing a case that supports an

---

[9]    Bayer submitted three briefs to the district court in the course of summary judgment proceedings:  (i) an opening brief in support of its own motion for summary judgment ("*Bayer Op. Br.*")'; (ii) a brief in response to Albemarle's motion for summary judgment ("*Bayer Resp. Br.*") and (iii) a reply brief in further support of its own motion for summary judgment ("*Bayer Repl. Br.*").

argument not made below, *Fairchild Aircraft Corp., supra,* 6 F.3d at 1128, a party may not preserve an issue by quoting a statute to the district court and making an argument based on that statute, for the first time, on appeal.

Before this Court, Bayer makes a host of new arguments based on Virginia's common law standards of good faith and the UCC's duty to act with "honesty in fact." *Bayer Br.* at pp. 25-26, 50-52. Having failed to give Judge Boyle the opportunity to consider and rule on these arguments, Bayer cannot present them to this Court.

### 6.    The district court's application of § 2-305 to the facts of this case was sound.

Bayer challenges what it characterizes as the district court's "flawed, circular reasoning," *Bayer Br.* at p. 29, suggesting that the court disregarded UCC § 2-305 entirely in favor of the express terms of the parties' Agreement. *Id.* Yet the district court opened its application of § 2-305 to this dispute by quoting the Official Comment to the statute: "the seller may fix *any price he may wish* by the express qualification that the price so fixed in good faith." J.A. 81 (emphasis added). At the start, then, the district court both acknowledged the good faith obligation of § 2-305 and recognized the seller's wide latitude in setting his price. Citing the foregoing authorities, the court went on to note § 2-305's principal focus on discriminatory pricing (a concern not at issue in this case), J.A. 81. Ultimately,

the court rightly concluded that the test for "commercially reasonable action under [§ 2-305]" turned on the facts of each case. *Id.*

Turning to the facts, the court cited the undisputed evidence that Albemarle had used a value-based pricing model to determine what to charge Bayer, J.A. 82, and it noted the concession of Bayer's own employee that a price increase to maintain a seller's profit margin would be legitimate. J.A. 83. The Court went on to acknowledge evidence that "Albemarle [had] sought to use its leverage over Bayer," J.A. 8—citing the email that Bayer makes so much of in its brief. In the end, however, the Court recognized that there was no evidence that Albemarle had committed the sort of egregious misconduct—such as trying to drive its counterparty out of business—that would qualify as bad faith. J.A. 83. Thus, the Court concluded, these two sophisticated parties should be left to their own bargain. J.A. 84.

Not only was the district court's reasoning consistent with that of the majority of courts that have construed § 2-305, it gave appropriate deference to the right and responsibility of sophisticated commercial parties to order their own affairs. As one court has put it, "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'" *Kham & Nate's Shoes No. 2 v. First Bk. of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). Bayer agreed to a

44

contract that expressly permitted Albemarle to raise its price for methyl bromide once per calendar quarter, and it surrendered a right to buy 80% of its required methyl bromide from a cheaper supplier if Albemarle charged too much. It does not now "promote justice to seek strained interpretations [of contracts] in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros., Inc.* 64 F.2d 344, 346 (2d Cir. 1933) (L. Hand, J.), cited in *Kham & Nate Shoes No. 2, supra,* 908 F.2d at 1358.

### 7. Bayer's prior material breach prevents it from suing Albemarle for breach of the Agreement.

As explained above, *supra* at pp. 1-2, the Agreement initially included a "meet or release" provision, which required Bayer to notify Albemarle in writing if it wanted to purchase from another source any of the 80% of its methyl bromide volume that it was required to buy from Albemarle. (J.A. 22). By 2010, however, the parties had settled on revised terms that required Bayer to purchase 100% of its methyl bromide requirements from Albemarle, although Bayer had the right to "put" the price to Albemarle, and, if Albemarle refused to meet the price, Bayer could then purchase up to 20% of its requirements elsewhere at the lower price. (J.A. 34).

During discovery, Bayer admitted that—after receiving notice of Albemarle's first price increase in March 2014—it purchased four shipments of methyl bromide from Chemtura without first notifying Albemarle and giving it a

chance to meet Chemtura's price. *Ware Decl.* at ¶ 21, (J.A. 158). Bayer admitted this to the district court, conceding "that it did not provide Albemarle with written notice of the Chemtura offer *as required*.'" *Bayer Op. Br.* at p. 24 (J.A. 569) (emphasis added). Bayer insists in its brief to this Court that this statement "should not be read to establish breach," *Bayer Br.* at p. 42, but it seems impossible to interpret it as anything other than a candid concession. The district court certainly read it as such, concluding that "Bayer appears to have conceded that it committed a material breach of the contract when it elected beginning in April 2014 to purchase 20% of its methyl bromide from a competitor without first employing the 'meet competition' procedure provided for in the sales agreement." J.A. 80.[10]

Like most states, Virginia follows the well-established rule that "a party who commits the first breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 254 Va. 111, 115-16, 487 S.E.2d 200, 203 (1997). Applying this principle, the district court concluded that Bayer could not sue to enforce the Agreement if it had been the first party to commit a material breach. J.A. 80-81. The district court went on to find that Albemarle's first, April 2014 price increase

---

[10]     Bayer suggests that it did not give the required notice to Albemarle before purchasing methyl bromide from Chemtura because "Bayer reasonably believed . . . that Albemarle would be unwilling to meet the $2.30 price[.]" *Bayer Br.* at 12. This suggestion, too, is a *post hoc* rationalization to buttress Bayer's position on appeal. There is no record evidence to substantiate what Bayer was thinking when it decided to breach the Agreement's "meet or release" clause

did not violate § 2-305's standard of good faith, citing undisputed evidence that that increase was non-discriminatory and non-arbitrary. *Id.* at pp. 6-9; (J.A. 81-84). Thus, the district court held, "Bayer may not now seek to enforce the contract that it first breached[.]" J.A. 84.

On appeal, Bayer takes issue with this conclusion, on several grounds. First, Bayer contends that its breach of the Agreement was not material. *Bayer Br.* at pp. 41-44. Yet this argument, too, is an argument that Bayer never made to the district court. Indeed, despite submitting three briefs and scores of pages to the court in connection with the parties' cross motions for summary judgment, Bayer devoted only a single paragraph to Albemarle's affirmative defense of prior material breach. *See Bayer Repl. Br.* at p. 7; (J.A. 70). And even in that paragraph, Bayer did not deny the materiality of its breach at all. Instead, it contended only that its breach "[was] not 'prior.'" *Id.* Having chosen to justify its conceded breach to the district court only on the grounds that it was "not prior," Bayer has waived the additional argument that it also was not material.

Even if Bayer had not waived its materiality argument, however, that argument would be unavailing. Virginia law does not require proof of damages to successfully assert a prior material breach defense. *Horton v. Horton*, 254 Va. 111, 116, 487 S.E.2d 200, 204 (1997) ("We disagree with [Plaintiff's] argument that a material breach was not proved since [Defendant] failed to establish an

47

amount of damages actually incurred as a result of [Plaintiff's] conduct."). Instead, a party may show a material breach by pointing to a failure to perform by the other party "that defeats an essential purpose of the contract." *Id.*

The undisputed record evidence shows that the Agreement's "Meet or Release" provision was the subject of extended negotiations over several years. (J.A. 34-39). That provision allowed Albemarle to keep track of the conditions of the market and gave Albemarle a reasonable opportunity to supply all of Bayer's methyl bromide needs. *Id.; Ware Decl.* at ¶ 22 (J.A. 158). Ware has testified that the provision represented a "essential purpose" of the parties' bargain, *id.,* and Bayer offered no evidence to the district court to rebut Albemarle's showing that the provision was, therefore, material. Bayer's attempt to make that showing here—for the first time—should be rejected.

In a separate argument (made also for the first time on appeal) Bayer challenges the district court's prior material breach finding on the grounds that it "authorize[s] continuing bad faith performance" by Albemarle. *Bayer Br.* at p. 44. Having elected to continue the contract after Bayer's breach, Bayer argues, Albemarle had to abide by the contract and could not breach the Agreement itself. Notably, Bayer cites no case law in support of this argument. Instead, it declares that a contrary result "cannot be[] the law." *Id.* at p. 45.

48

As the district court recognized, however, it is the law.  But first, to put the issue in perspective, it is important to note that the court did *not* "authorize[] continuing bad faith performance" by Albemarle.  Instead, the district court simply applied longstanding Virginia law to rule that, having first breached the Agreement itself, Bayer could not be heard to complain of its counterparty's alleged breach.  In support of its holding, the district court cited *Tandberg, Inc. v. Adv. Media Design, Inc.*, No. 1:09-CV-863, 2009 WL 8705814, at *4 (E.D. Va. 11, 2009).  In that case, Judge Ellis of the Eastern District of Virginia reviewed decades of jurisprudence from the Supreme Court of Virginia to resolve precisely the issue presented here:  whether a party that commits a first material breach of contract (like Bayer) may sue on a subsequent breach by a counterparty who continues the contract after the first party's breach.  Judge Ellis acknowledged that a 1940 case had held that "a contractual party [like Albemarle] who elects to continue the contract in spite of the other party's material breach may not argue that his subsequent breach of the contract is therefore excused."  *Id.* at *3.  But, Judge Ellis went on to observe, "a more recent and far more extensive line of Supreme Court of Virginia decisions [including *Horton, supra*] holds that a contractual party who first commits a *material* breach may not sue to enforce subsequent breaches by the other party."  *Id.*  Judge Ellis accepted this line of cases, as did Judge Boyle in this case.

49

In essence, what this case law shows is that Virginia takes a sensible, "unclean hands" approach to competing breach of contract claims. A party who first materially breaches a contract has dirtied his own hands and may not be heard to complain that his counterparty breached, too. It is clear that Bayer does not like this rule. But as Judges Ellis and Boyle have concluded, it is indisputably the law of Virginia.

**B.    The district court Properly Granted Summary Judgment to Albemarle on Bayer's UDTPA Claim**

In proceedings before the district court, Bayer relied on a single statement by Albemarle's Wes Ware in support of its claim under North Carolina's Unfair and Deceptive Trade Practices Ac: Wes Ware's representation that Albemarle's first, April 2014 price increase was a "complete 100% pass through" of costs from Albemarle's toller, Chemtura. *See* J.A. 85 ("[Bayer] relies on one statement by Albemarle to support its UDTPA claim."); *Bayer Op. Br.* at pp. 20-21 (citing only the "pass-through" statement by Mr. Ware as basis for UDTPA claim); *Bayer Repl. Br.* at p. 9 (same). Now, on appeal, Bayer seeks to buttress its UDTPA claim by adding three new grounds: (i) that Albemarle engaged in conduct "manifesting an inequitable assertion of power or position," *Bayer Br.* at pp. 45-49; (ii) that Ware also represented that Albemarle's pricing was not "opportunistic or punitive," *Bayer Br.* at pp. 57-58; and (iii) that Albemarle breached common law and UCC obligations to act with "honesty in fact."

50

Bayer's effort to rekindle a host of new UDTPA claims from the ashes of its single old claim must be rejected. The district court rightly concluded that Bayer could not bring a UDTPA claim based on a misrepresentation that it did not believe. *See Order* pp. 10-11 (J.A. 85-86). And even if Bayer had not waived its other claims, those claims, too, would fail on the merits.

### 1. Bayer cannot bring a UDTPA claim against Albemarle based on an "inequitable assertion of power or position."

For the first time on appeal, Bayer makes the argument that "Albemarle's conduct here manifested an inequitable assertion of power [under North Carolina's UDTPA]." *Bayer Br.* at p. 47. As noted above, Bayer did not make this argument in any of the three summary judgment briefs that it submitted to the district court. Indeed, Bayer did not even "intimate" the argument during summary judgment proceedings, much less "press" the argument, as the law requires. *See CoreTel, supra,* 808 F.3d at 988. Accordingly, Bayer has waived the argument and cannot make it here.

Bayer did make the conclusory allegation, in its Second Amended Complaint, that "Albemarle's conduct also constitutes an inequitable assertion of its power or position[.]" To preserve the issue for appeal, however, it was required to "press" the argument in response to Albemarle's motion for summary judgment, which it did not do. To the contrary, in the last of its three summary judgment briefs presented to the district court, Bayer emphasized that its Second Amended

51

Complaint added a UDTPA claim based on a misrepresentation; Bayer made no mention in that brief (or in its prior two briefs) of any alleged "inequitable assertion of power or position." *Bayer Repl. Br.* at p. 9.

Even if Bayer were allowed to make this new claim on appeal, it would still fail. Bayer's claim, in essence, is that Albemarle is liable under the UDTPA because it raised prices too steeply, even though the Agreement expressly permitted Albemarle to raise its prices once per calendar quarter and contained no limitation on the amount of the increases. Bayer also contends that Albemarle "manipulate[ed] the timing of its price increase so that Bayer would be stuck in the Agreement for 21 months," even though the Agreement required only that Albemarle give written notice of a price increase at least 15 days before the start of a calendar quarter (which Albemarle indisputably did).

At the outset, it should be emphasized that "conduct carried out pursuant to contractual relations rarely violates [North Carolina's Unfair Trade Practice's Act.]; . . . a breach of contract must be particularly egregious to permit recovery under [the Act.] *South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*, 284 F.3d 518, 536 (4th Cir. 2002). Furthermore, as the North Carolina Court of Appeals observed in rejecting a UDTPA claim, "[i]t is not for the courts to rewrite the parties' agreement should one of the parties, at a later date, desire a change[.]" *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C. App. 285, 291 (2004). The

*McInerney* court went on to hold that "there can be nothing 'unfair'] in [the] exercise of . . . [a contract] right").

Ignoring these principles, Bayer now invokes the UDTPA in an attempt to get this Court to "rewrite the parties' agreement." *Id.* This Court should reject the invitation. Bayer is a sophisticated corporate behemoth that negotiated and renegotiated the parties' methyl bromide agreement multiple times over a decade. In the first version of the Agreement, Bayer relied on a "meet or release" clause that allowed it to fill 80% of its methyl bromide needs from another, cheaper source. Later, Bayer surrendered that protection in favor of a diluted version that gave it "meet or release" protection with respect to only 20% of its methyl bromide needs (the provision that Bayer later breached). Other than this provision—and the provision limiting Albemarle to one price increase per calendar quarter, on 15 days' written notice—the parties did not impose any other limitation on the price that Albemarle could charge for methyl bromide. Far from acting "inequitably," Albemarle was following the terms of the bargain that the parties themselves had struck—and restruck—pursuant to protracted, arms-length negotiations.

Bayer cites only one case in which a court has held that a party exercised its power inequitably: *Riese, supra*. The *Riese* court, however, found highly significant the defendant's use of its contract leverage to deny the plaintiff *all* profit—forcing the plaintiff to work on a complicated construction project for two

years for nothing in return. 284 F.3d at 539-40. Here, however, there is no dispute that Bayer continued to reap millions in profits from its herbicide business even after Albemarle raised its prices. *See supra* at pp. 13-15.

In sum, Bayer's new UDTPA claim amounts to nothing more than an effort by a sophisticated corporation to escape the consequence of its own bad bargain that, after years of profits, it has reconsidered. This Court should reject this claim, particularly in the absence of any harm to the consuming public, which the UDTPA was designed to protect. *See Exclaim Marketing, LLC v. DirecTV, LLC*, 134 F. Supp.3d 1011, 1020 (E.D.N.C. 2015) (observing that "courts have viewed the rights of businesses to sue other businesses for violations of the [UDTPA] with a much more skeptical eye," under circumstances not present in this case).

### 2. Any claim that Bayer brings for an allegedly deceptive representation by Albemarle fails because Bayer did not believe the representation.

On appeal, Bayer contends that two *separate* statements by Mr. Ware expose Albemarle to liability under the UDTPA: "Albemarle acted deceptively when it[] . . . represented to Bayer that the first price increase . . . was a 'complete 100% cost pass through' **and** not the product of any 'opportunistic or punitive' behavior." *Bayer Br.* at 52. Before the district court, however, Bayer made it clear that its UDTPA claim was based solely on Mr. Ware's representation that the first price increase was a "complete 100% pass through." *See supra* at p. 46.

Whatever statement Bayer relies on, however, cannot serve as the basis of liability—whether under the UDTPA or under the UCC's "honesty in fact" standard.  That is so because, as the district court recognized, Bayer's corporate designee (Mr. Kandlur) admitted in his deposition that he did not believe what Mr. Ware said about the first price increase:

> **Kandlur:**  What I'm saying is that they told us that the cost increase is coming mainly because of the tolling fee price increase which is being passed on.  But that did not gel with the situation that we were seeing in the market . . . because a tolling fee by itself, from my experience, cannot be more than the full cost price of a material.
>
> * * * *
>
> **Q:**  [S]o back up for a moment.  It sounds like what you wanted was the explanation.  Albemarle gave you an explanation.  **You just didn't believe it** because of what you were seeing in the market, is that right?
>
> **Kandlur:**  Yes.

*Kandlur Dep.* at 179:22-180:9, 180:21-181:2 (J.A. 176-77) (emphasis added), cited by the district court at J.A. 11.

This testimony is fatal to Bayer's unfair trade practices claim.  North Carolina law requires that "[w]here an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show 'actual reliance' on the alleged misrepresentation in order to establish that the alleged misrepresentation 'proximately caused' the injury of which plaintiff complains."

*Tucker v. Boulevard At Piper Glen, LLC*, 150 N.C. App. 150, 153, 564 S.E.2d 248, 251 (2002) (quoting *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 664, 464 S.E.2d 47, 58 (1995)). The Supreme Court of North Carolina affirmed this basic principle in *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 747 S.E.2d 220 (2013), holding that "[i]n the context of a misrepresentation claim brought under section 75–1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." *Bumpers,* 367 N.C. at 90, 747 S.E.2d at 227 (citing *Hageman v. Twin City Chrysler–Plymouth Inc.*, 681 F. Supp. 303, 308 (M.D.N.C. 1988)).

Bayer misapprehends these principles, going so far as to accuse the district court of "confus[ing] deception . . . with reliance." *Bayer Br.* at p. 53. It is Bayer, however, that is confused. A similar confusion plagued the plaintiff in *Hageman*:

> The requirement that the plaintiff prove actual causation is probably the least understood concept in this area of the law. Litigants frequently focus on proving a deceptive act and an injury without attempting to show the concatenating link of actual causation. To prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation. Stated differently, the deceptive act or practice must have actually misled or deceived the plaintiff. It is this concept that produces confusion. Plaintiffs point to the oft repeated language that "proof of actual deception is not required," and argue that they need not prove that they were "actually deceived." Arguments of this

56

nature demonstrate a fundamental misunderstanding of what is meant
by the phrase "proof of actual deception is not required."

681 F. Supp. 303, 308. The *Hagemann* court went on to trace the roots of unfair

trade practices law, explaining that the phrase "proof of actual deception is not

required" is intended to represent a relaxation of the scienter requirement in

traditional deceit actions. *Id.* at 308-09. But, the court concluded:

> [E]ven with this relaxed burden of proof, a private plaintiff cannot
> recover in an action for a deceptive trade practice if the plaintiff is
> unable to prove that the deceptive practice worked. Basic legal
> principles dictate that a private plaintiff must show that he or she
> suffered an injury as a result of a defendant's acts. The plaintiff must
> have been deceived; plaintiff must suffer "actual injury *as a proximate
> result* of defendant's deceptive statement or misrepresentation."

*Id.* at 309 (emphasis in original).

Bayer asks this Court to create a new rule of law, contrary to established

North Carolina authority, to find that one can rely on a statement that it did not

believe. Both the foregoing authorities and common sense compel the opposite

conclusion.

## IV.    CONCLUSION

For the reasons set forth above, Albemarle respectfully requests that this

Court affirm the district court's grant of summary judgment to Albemarle on all of

Bayer's claims.

## V.   REQUEST FOR ORAL ARGUMENT

Albemarle Corporation requests permission to present oral argument to the Court in support of its position on this appeal.

This 1st day of September, 2016.

s/ Stephen M. Cox

John R. Wester
jwester@robinsonbradshaw.com
N.C. State Bar No. 4660
Stephen M. Cox
scox@robinsonbradshaw.com
N.C. State Bar No. 23057
David C. Kimball
dkimball@robinsonbradshaw.com
N.C. State Bar No. 36869

**ROBINSON, BRADSHAW & HINSON, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina  28246
(704) 377-2536

ATTORNEYS FOR DEFENDANT-APPELLEE
ALBEMARLE CORPORATION

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 16-1555        **Caption:** Bayer CropScience LP v. Albemarle Corporation

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✔]    this brief contains _____13,990_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✔]    this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010_____ [*identify word processing program*] in
   Times New Roman 14_____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Stephen M. Cox_____

Attorney for Albemarle Corporation_____

Dated: 9/1/2016_____

# CERTIFICATE OF SERVICE

I certify that on __9/1/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Samuel Batiste Hartzell                  Pressly McAuley Millen
Womble Carlyle Sandridge & Rice, PLLC    Womble Carlyle Sandridge & Rice, PLLC
P.O. Box 831                             P.O. Box 831
Raleigh, NC 27602                        Raleigh, NC 27602


s/ Stephen M. Cox                        September 1, 2016
_____                  _____
Signature                                Date